# United States Navy-Marine Corps Court of Criminal Appeals

_____

**UNITED STATES**
Appellee

**v.**

**Royal J. WASHINGTON**
Private First Class (E-2), U.S. Marine Corps
Appellant

**No. 201700242**

Appeal from the United States Navy-Marine Corps Trial Judiciary.

Decided: 8 February 2019

Military Judges:
Lieutenant Colonel E.H. Robinson, USMC (arraignment);
Colonel D.W. Gardner, USMC (trial).

Sentence adjudged 19 April 2017 by a general court-martial consisting of officer and enlisted members convened at Camp Foster, Okinawa, Japan. Sentence by convening authority: reduction to E-1, forfeiture of $1,499.00 pay per month for 4 years, confinement for 4 years, and a dishonorable discharge.

For Appellant:
_Lieutenant Commander Jon Taylor, JAGC, USN;_
_Captain Thomas R. Fricton, USMC._

For Appellee:
_Lieutenant Kimberly L. Rios, JAGC, USN;_
_Major Kelli A. O'Neil, USMC._

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 30.2**

_____

Before FULTON, TANG, and CRISFIELD
*Appellate Military Judges.*

Judge TANG delivered the opinion of the Court, in which Senior Judge FULTON and Judge CRISFIELD joined.

TANG, Judge:

A general court-martial convicted the appellant, contrary to his pleas, of one violation of Article 120, UCMJ, 10 U.S.C. § 920 (2012). Though charged with two specifications alleging violations of Article 107, UCMJ, 10 U.S.C. § 907, he was acquitted of those offenses.

The appellant avers five assignments of error (AOEs): (1) the conviction is factually and legally insufficient; (2) the military judge erred by permitting the government to elicit "human lie detector" testimony from an agent of the Naval Criminal Investigative Service (NCIS); (3) the military judge abused his discretion by denying the defense motion to compel the expert assistance of a forensic psychologist and further erred in disallowing the defense-funded expert psychologist to testify by telephone; (4) the military judge erred by denying a challenge for cause of a member who believed homosexuality is a sin; and (5) the trial defense counsel rendered ineffective assistance of counsel. Because we find the appellant's conviction is factually insufficient and set aside the appellant's conviction, his remaining AOEs are rendered moot.

## I. BACKGROUND

### A. The Appellant's Relationship with Sergeant W and the Alleged Sexual Assault

The appellant was stationed in Okinawa, Japan. In March 2016, he met Sergeant (Sgt) W through the mobile application Grindr. Sgt W described Grindr as a "gay social app."[1] Sgt W is openly homosexual and married, but his husband did not accompany him to Okinawa. Sgt W stated he used Grindr because he wanted to make friends who could relate to him, explaining that it was difficult for him to meet other homosexual men in the Marine Corps.[2] Sgt W agreed that many people use Grindr as a "hookup application," allowing individuals to find other individuals interested in casual sexual encounters.[3]

---

[1] Record at 346.

[2] *Id.* at 408.

[3] *Id.* at 346, 407.

After they first met, the appellant and Sgt W had intermittent contact for over a month, conversing through Grindr and then through Snapchat, an electronic messaging application that automatically deletes messages after the recipient reads them. The men socialized several times, usually one-on-one in Sgt W's barracks room.

Sgt W underwent an extensive leg surgery in May 2016 to repair a compound fracture of his tibia. He was prescribed Percocet to manage "excruciating" pain during his recovery.[4] He was directed to take two pills, as needed for pain. Percocet is a combination of an opioid and Tylenol.[5] Sgt W testified Percocet would "knock" him out and make him "drowsy" and "incapacitated."[6]

Sgt W testified that on Monday, 20 June 2016, his pain was so severe that he could barely straighten his leg. That day, the appellant texted him after Sgt W had retired to his barracks room for the night around 2200. Sgt W told the appellant his leg was hurting, so the appellant offered to massage Sgt W's leg, as he had done in the past. Sgt W accepted the appellant's offer. Sgt W had already taken two Percocet pills and, still hurting, decided to exceed the prescribed dosage by taking two more pills just prior to the appellant's planned arrival.

The appellant came to Sgt W's barracks room around 2230 and, according to Sgt W, sat on a second, unoccupied bed. Sgt W testified that soon after the appellant arrived, and without having received the planned leg massage, he told the appellant he would be going to sleep soon. Sgt W stated he then fell asleep on his side, wearing gym shorts, with his injured leg propped up on a pillow. He felt nothing until he awoke the next morning around 0650 to the sound of his alarm clock. When he awoke, he was laying on his back.[7]

Upon waking alone in his bed Tuesday morning, Sgt W stated he felt pain in his anus and saw a three-to-four-inch "dark-red-in-color" stain on his tan comforter.[8] He believed it was blood. He immediately texted the appellant and asked whether they had sex on "Monday night," to which the appellant replied

---

[4] Record at 403.

[5] *Id.* at 612.

[6] *Id.* at 404.

[7] Neither party elicited evidence about Sgt W's state of dress when he awoke.

[8] Record at 422.

they did.[9] He stated the appellant also texted, "[w]as that not okay?" and that he had no further communications with the appellant after Tuesday morning.[10]

**B. Sgt W's Report of Sexual Assault and the NCIS Investigation**

Sgt W made a restricted report of sexual assault. He stated he sought medical treatment the day after the sexual assault, which would have been Tuesday, 21 June 2016, but he did not immediately make an unrestricted report.[11] About 10 days later, he made an unrestricted report of sexual assault and submitted to a partial sexual assault forensic examination (SAFE). Neither party presented any evidence of the SAFE results at trial. Investigator S, an investigator assigned to the NCIS Adult Sexual Assault Team in Okinawa, interviewed Sgt W. Sgt W told him that he met the appellant on Grindr, but he said their relationship was strictly a platonic friendship. Sgt W said he consistently rebuffed the appellant every time the appellant tried to pursue a romantic or sexual relationship with him. Sgt W stated he never had any consensual sexual or intimate contact with the appellant.

When agents asked Sgt W if he would permit a search of his cell phone, he would not allow a forensic examination, nor would he permit the agents to touch his phone. Sgt W had already taken screenshots of portions of his text conversation with the appellant and, keeping his phone in his possession, allowed the agents to photograph his phone displaying the two screenshots. The messages, as captured, do not show the date they were sent or received. The first screenshot depicted a portion of a conversation with a header labelled, "Today," and contained the following exchange:

>    Sgt W:      Did we have sex the Monday night?
>
>    Appellant:  Yes[12]

---

[9] Record at 423; Prosecution Exhibit (PE) 2.

[10] As further described below, Sgt W provided screenshots of a part of his text message conversation with the appellant. The screenshots did not include any text from the appellant asking "[w]as that not okay?" *See* Record at 348-49, 450.

[11] PE 4 contains Sgt W's medical records and indicate an "initial encounter" date of 24 June 2016 for this treatment.

[12] PE 2 at 1. Text reproduced as written in original.

The second screenshot contained a header labelled "Tuesday," and contained this exchange:

> Appellant: Hi [Smile emoticon]
>
> Sgt W: Please leave me alone.
>
> Appellant: [Sad emoticon with tear] Oooooh Ok, I'm sorry for bothering you. [Sad emoticon]
>
> Sgt W: As in don't message me again.
>
> Appellant: Wow! Well looks like I lost yet another friend . . . Very well as you wish
>
> Sgt W: You're no friend . . .
>
> Appellant: That's how you think of me wow OK then[13]

Sgt W adamantly maintained that the appellant also texted him to ask, "Was that not okay[?]" in reference to Sgt W's question whether they had sex Monday night. Sgt W specifically stated the comment upset him and that he saved the text in the text message conversation.[14]

On 1 July 2016, Special Agent G took photographs of Sgt W's room and seized his comforter for forensic testing. Sgt W did not launder the comforter prior to its seizure; he had merely folded it and stored it. Special Agent G did not see the three-to-four-inch dark red blood stain Sgt W described, or any blood stain at all. However, using an alternate light source, which permits one to see "things that you would not normally see under the naked eye," he did notice a "slight discoloration."[15] Forensic examination revealed the comforter had semen and blood on it, containing Sgt W's DNA and an unidentified DNA profile.[16]

Also on 1 July 2016, Investigator S interviewed the appellant. The appellant admitted he met Sgt W through the Grindr application and that he had anal sex with Sgt W on the night of 20-21 June 2016. He told the agents he had consensual sex with Sgt W twice before the alleged sexual assault and that he was pursuing a relationship with Sgt W. He described both prior sexual encounters in detail. He stated on 20 June 2016, Sgt W invited him to his barracks room to massage his leg. When the appellant arrived, he found Sgt W

---

[13] PE 2 at 2. Text reproduced as written in original. Record at 348-49.

[14] Record at 348.

[15] *Id.* at 481-82.

[16] This evidence was not presented through an expert in DNA analysis, but rather, was elicited without objection through an NCIS agent who reviewed the results.

shirtless. The appellant stated he got in bed, under the covers, with Sgt W. Then they kissed, undressed, and engaged in anal sex, with the appellant penetrating Sgt W's anus. The appellant stated that Sgt W masturbated himself to climax afterwards.

When asked about his text messages with Sgt W, the appellant agreed Sgt W texted him to ask whether they had sex "Monday night." But he stated that conversation took place Thursday, not Tuesday morning as Sgt W claimed. The appellant consented to a forensic search of his cell phone, but agents could not recover any text messages with Sgt W. The appellant explained that Sgt W demanded he delete their text message conversation and that he did so. Only one item of evidentiary value was recovered from the appellant's phone: a self-photograph of Sgt W depicting Sgt W standing in front of a mirror, shirtless, with his pants unzipped to expose a substantial portion of the front of his underwear.

Investigator S contacted Sgt W's victim's legal counsel, asking to conduct a follow-on interview. He wanted to ask Sgt W about details the appellant provided, including the appellant's claim that the two men had engaged in consensual sex twice before the alleged sexual assault. Sgt W refused.

Investigator S asked the appellant if he would submit to a polygraph examination.[17] The appellant agreed. He met with Special Agent P, an agent trained in advanced interrogation techniques at the Defense Academy for Credibility Assessment. During his initial interview with Special Agent P, the appellant maintained that Sgt W was awake and participated in consensual anal sex. Special Agent P persisted in his interrogation and administered the polygraph. Then the appellant changed his statement and told Special Agent P his first statement was not true.

The appellant told Special Agent P he knew Sgt W was asleep during sex. He stated Sgt W awoke several times during the sex act. He said Sgt W helped lubricate the appellant's penis to help him achieve penetration, and at one point, Sgt W made a comment, "It's in and out, not up and down."[18] He also said Sgt W awoke one or two more times and placed his hand on the appellant's stomach as if to indicate the appellant was doing something wrong. The appellant would stop moving, but then continue when he thought Sgt W fell back asleep. The appellant eventually lost interest when he realized he would not ejaculate. He dressed and left around 0140 to 0200. The appellant admitted he

---

[17] At trial, the parties referred to this interrogation as a "re-interview," and Special Agent P made no reference to a polygraph examination during his trial testimony. Record at 494.

[18] Record at 512; PE 9 at 1-2.

lied when he told Investigator S that Sgt W masturbated and that Sgt W was awake and participated in the sexual act. Special Agent P drafted a written statement, with the appellant's input, and the appellant signed it. The entire "re-interview" process lasted nearly six hours.

## C. Expert Pharmacist Testimony about Percocet

During trial, both the government and defense presented evidence from expert pharmacists to describe the effects of Percocet on the human body. The government's witness testified that Percocet can cause drowsiness and users may experience slowed reaction times. The purpose of Percocet is to inhibit the feeling of pain. Different people react to drugs in different ways. On cross-examination, the government's expert conceded that extensive studies demonstrated that only 4% of patients experienced drowsiness, and fewer than 1% experience memory loss or "blackouts."[19] The government expert further testified it would be "highly unlikely," at least with appropriate dosing, for a patient to have such severe side effects that they could be made to sleep so soundly that they would not notice a non-consensual penetration of their anus by a penis.[20] However, the government's expert witness testified that four Percocet pills in a short period of time is not a recommended dose.

The defense expert pharmacist agreed that drowsiness is a known side effect of Percocet, and she described drowsiness as a central nervous system side effect that can cause impaired vision, slightly slurred speech, slower reaction time and muscle weakness. Although Percocet causes drowsiness or sleepiness, she explained that it does not cause a person to *fall asleep*, to stay asleep, or to sleep more deeply. Percocet would not cause a person to sleep through ordinary stimulus, such as a person attempting to shake them awake. Most importantly, she testified that it is "very unlikely" and "almost impossible" that Percocet would cause a person to "pass out," even if a man of Sgt W's height and weight took four Percocet pills in a short period of time.[21] She further stated that amnesia is not a recognized side effect of Percocet.

---

[19] Record at 394.

[20] *Id.*

[21] *Id.* at 613. The defense expert based this opinion on Sgt W's weight of 135 pounds and height of 67 inches.

**D. The Military Judge's Instructions and the Findings Worksheet**

The sole Specification under Charge I alleged, in pertinent part:

> In that [the appellant], did, at or near Okinawa, Japan, on or about 21 June 2016, commit a sexual act upon [Sgt W], to wit: penetrate [Sgt W's] anus with his penis, when the [appellant] knew or reasonably should have known that [Sgt W] was asleep, unconscious, and otherwise unaware that the sexual act was occurring.[22]

The military judge instructed the members they could find the appellant guilty on only one of the three charged theories of liability, that Sgt W was asleep, unconscious, or otherwise unaware. He charged:

> The government does not have to prove all of these for you to return a guilty verdict on this charge. Proof beyond a reasonable doubt on one is enough. But in order to return a guilty verdict, you must agree by the required number of votes that the same one has been proved.[23]

He provided the members with a findings worksheet that contained three check boxes, one alongside each theory of liability. The worksheet contained a note indicating:

> You should select one below, by checking the box next to that reasons [*sic*], in which you believe the Government proved beyond a reasonable doubt as to what [the appellant] knew or reasonably should have known when he committed the sexual act.[24]

The members checked the box for "otherwise unaware that the sexual act was occurring" and left the boxes for "asleep" and "unconscious" blank.

Although the appellant was charged with violations of Article 107 for making two false statements, the members acquitted him of both.[25]

---

[22] Charge Sheet.

[23] Appellate Exhibit (AE) XLI at 2.

[24] AE XXXIX at 1.

[25] The pertinent allegedly false statements were: (1) "[Sgt W] was fully awake and participated in the sex," or words to that effect; and (2) "After I could not finish, [Sgt W] started to jack off, he came on his body, and he told me to get the T-shirt by the TV to wipe off with," or words to that effect." Charge Sheet.

## II. DISCUSSION

### A. *United States v. Sager* and the Meaning of "Otherwise Unaware"

In *United States v. Sager,* the Court of Appeals for the Armed Forces (CAAF) examined the theory of liability under Article 120(b)(2), involving a victim who is "otherwise unaware" of the sexual act. *United States v. Sager,* 76 M.J. 158 (C.A.A.F. 2017). The facts and issues presented in *Sager* are very similar to those in the appellant's case. In *Sager,* the members also acquitted on the "asleep" and "unconscious" theories of liability and convicted on the "otherwise unaware" theory.[26] In deciding *Sager,* the CAAF evaluated whether the element "'asleep, unconscious, or otherwise unaware' create[d] three separate theories under which one may be guilty of the offense or . . . the language create[d] a single theory of criminal liability." *Id.* at 161. The CAAF expressly rejected this court's interpretation that "asleep or unconscious are examples of how an individual may be otherwise unaware." *Id.* at 160 (quoting *United States v. Sager,* 2015 CCA LEXIS 571 at *1-2 (N-M Ct. Crim. App. 29 Dec 2015)). Instead, the CAAF held that "asleep," "unconscious," and "otherwise unaware" constitute three separate theories of liability. Applying both the "ordinary meaning" and the "surplusage" canons of statutory construction, the CAAF held the words "asleep," "unconscious" and "or" would be "mere surplusage" if they did not reflect separate theories of liability. *Id.* at 162.

Applying the "plain meaning" of the statute and relying on the dictionary definition of "otherwise," the CAAF held "otherwise unaware" means "unaware in a manner different from asleep and different from unconscious." *Id.* Based on the CAAF's construal, a victim cannot simultaneously be asleep *and* "otherwise unaware," nor can a victim be simultaneously unconscious *and* "otherwise unaware." The theories are mutually exclusive.[27]

Our interpretation of "otherwise unaware" comports with the interpretation of our sister service court, the Army Court of Criminal Appeals. In *United States v. Brantley,* the Army court was ordered to re-evaluate its prior opinion

---

[26] In *Sager,* the military judge presented the members with a findings worksheet that invited them to choose between "knew" or "should have known" and to choose between "asleep," "unconscious," and "otherwise unaware." The various choices were expressed in parentheses. The members circled "otherwise unaware."

[27] The Army Court of Criminal Appeals has subsequently held that a victim can be both asleep *and* unconscious. The third theory, that the victim is "otherwise unaware," is different because of the modifier "otherwise." *See United States v. Williams,* 78 M.J. 543, 547 (A. Ct. Crim. App. 2018).

in light of the CAAF's opinion in *Sager. United States v. Brantley,* 2017 CCA LEXIS 742 (A. Ct. Crim. App. 30 Nov 2017) (unpub. op.). Like the appellant in this case, Private First Class Brantley was convicted of a violation of Article 120(d) solely on theory that his victim was "otherwise unaware" of the sexual contact.[28] The Army court concluded the government had to prove "that the victim was not unconscious, was not asleep, but was unaware of the sexual conduct." *Brantley,* 2017 CCA LEXIS 742 at *5. The court explicitly rejected the government's contention that "otherwise unaware" "nonetheless incorporates a sleeping or unconscious victim." *Id.* We agree that a plain reading of the statute, consistent with the CAAF's interpretation in *Sager,* requires that an "otherwise unaware" victim be neither asleep nor unconscious but still unaware of the sexual act.

We will review the factual sufficiency of the appellant's conviction in light of the guidance from our superior court in *Sager*. Because we reverse the appellant's conviction for lack of factual sufficiency, we need not evaluate legal sufficiency.

## B. Factual Sufficiency

When reviewing a case for factual sufficiency, we must "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Washington,* 57 M.J. 394, 399 (C.A.A.F. 2002). We must weigh all of the evidence in the record of trial, recognizing that we neither heard nor saw the witnesses. *Id.* We take a "fresh, impartial look at the evidence," presuming neither innocence nor guilt. *Id.*

Conducting our *de novo* factual sufficiency review, we find the evidence does not support the appellant's conviction on the theory of "otherwise unaware." We can only affirm the appellant's conviction if we are convinced beyond a reasonable doubt that Sgt W was unaware of the sexual act for a reason *other* than sleep or unconsciousness. If Sgt W was *aware* of the sexual act, he was not "unaware" of it for any reason.

---

[28] Although *Brantley* involved a sexual contact and the appellant was convicted of a sexual act, the statutory definitions of Article 120(d) incorporate those in Article 120(b)(2) but apply to sexual contacts.

The government's evidence showed Sgt W was either asleep or unconscious or he was aware of the sexual act.[29] We first examine Sgt W's testimony to determine whether there is any evidence that he was "otherwise unaware."

According to Sgt W's testimony, he was asleep. He fell fast asleep after taking four Percocet pills, and did not wake until his alarm sounded the next day. He testified that he did not feel anything; he did not see anything; he did not say anything. He had no memory of any sexual act. He only suspected the appellant had sex with him because his anus hurt and because he saw the three-to-four-inch red stain he believed was blood. Sgt W's testimony yields no reason to believe he was "otherwise unaware" of the sexual act for a reason other than he was asleep.

Thus, if there is any evidence to sustain the appellant's conviction, it must come from his own statements. In the first statement to Investigator S, the appellant said Sgt W was awake and participated in the sexual act and then masturbated himself to ejaculation. This statement provides no support to find that Sgt W was ever in a state of "otherwise unawareness." Therefore, evidence, if any, of Sgt W's "otherwise unawareness" would have to be found in the appellant's second statement.

In his re-interview with Special Agent P, the appellant said Sgt W alternated between being asleep and awake. The appellant's statement admitting that Sgt W was asleep cannot sustain a conviction on the theory that Sgt W was "otherwise unaware." So we will carefully analyze the points when appellant described Sgt W as being awake or falling back asleep. The appellant described his sexual encounter with Sgt W as follows:

> [A]nd at some point we began to make out, kissing and rubbing on each other's bodies. . . . This lasted about 8-10 minutes, then he just stopped kissing me and turned over to face the wall, and I just laid behind him rubbing his shoulders and back. At some point I realized he fell asleep, so I pushed him to wake him up, and he responded for a second, but he eventually fell asleep again. . . . I am not sure if he was awake or asleep, but at some point, I attempted to insert my penis into his anus, and it wouldn't go in, due to a lack of lubricant. [Sgt W] also realized it wouldn't go in, so *he reached up with his right hand, and got*

---

[29] In closing, the trial counsel argued: "The second piece is that the accused must have known or reasonably believed that the victim, [Sgt W], was asleep, unconscious, or otherwise unaware. Based on the testimony of both [Sgt W] and both of the pharmacists, the government would submit that we've proven beyond a reasonable doubt that he was asleep during that time." Record at 652.

*some of his own saliva, and rubbed it on my penis.* He then rolled back over towards the wall, and I was then able to insert my penis into his anus. I had sex with him for maybe 3-5 minutes and at some point, he *put his right hand against my stomach as if to indicate something was wrong and I needed to stop.* I stopped momentarily, however [Sgt W] fell immediately back to sleep, and his arm fell limp. After he fell back to sleep, I started again to have sex with him for another 3-5 minutes, and again, *he woke up and put his hand on my stomach*, so I stopped. He *mumbled the words, "It's in and out, not up and down,"* but I am not sure what exactly he meant, only that I must be doing something wrong, so I stopped. A short time, later, I noticed he fell back to sleep, so I started having sex with him again, pushing my penis into his anus. A third time, *he stopped me by placing his hand back on my stomach*, so I stopped. This time he did not say anything, and his arm fell limp again. I started up one more, [*sic*] time, however [I] realized he was sound asleep, and I realized I was not going to ejaculate, and lost the mood, so I stopped altogether. At that point, I leaned up on my elbow to look at his face, and could tell his eyes were closed and he was asleep.[30]

All told, the appellant described five points in time just before and during the sexual act when Sgt W was awake. All five times, Sgt W was aware of the sexual act. Lubricating the appellant's penis indicates awareness of the sexual act the appellant was attempting and Sgt W's knowledge that adding lubrication would assist. Sgt W's action in directing the appellant, "[i]t's in and out, not up and down," likewise demonstrates awareness of the sexual act and providing feedback to improve the appellant's performance. And the times Sgt W placed his hand on the appellant's stomach, in the context of his other behaviors, also indicates his awareness of the sexual act and that he was attempting to alert the appellant to his desire for the appellant to either pause, cease, or modify his behavior.[31] Even though these actions may demonstrate a withdrawal of consent or lack of consent, they also demonstrate awareness.[32]

---

[30] PE 9 at 1-2 (emphasis added).

[31] The record evidence shows this movement was a reaction by Sgt W in response to his *awareness* that the appellant was penetrating him. The government did not present any evidence to show this movement was a non-volitional act.

[32] The government could have charged the appellant with a violation of Article 120(b)(1)(B) or Article 120(b)(3)(A), but it did not.

And that awareness, at all points when Sgt W was not asleep, renders the appellant's conviction unsustainable.

The appellee argues that Sgt W was "otherwise unaware" of the sexual act because: [33] (1) Sgt W took four Percocet pills in a short period of time, and he testified that Percocet makes him drowsy; (2) an expert pharmacist testified that Percocet causes a person to be "not alert," and that a person should not drive while taking Percocet; (3) the appellant stated that Sgt W's hand "fell limp" a few times during the sexual act; and (4) the appellant stated that Sgt W mumbled vice spoke clearly when he said "It's in and out, not up and down."

We do not agree that these points of testimony support a finding beyond a reasonable doubt that Sgt W was "otherwise unaware" of the sexual act. We find "alertness" to be different from awareness. An unalert person is aware of his or her surroundings but lacks mental sharpness. More importantly, Sgt W never testified that he suffered from a lack of alertness—he said he was asleep. The appellant's statement that Sgt W's hand "fell limp" signifies that Sgt W either went to sleep or lapsed into unconsciousness, but does not demonstrate that he was "otherwise unaware." Nor does mumbling signify that Sgt W was unaware of the sexual act.

To help understand the effects of Percocet on Sgt W, we have the testimony of not one, but two expert pharmacists. Their testimony only reinforces our view that the appellant is not guilty beyond a reasonable doubt on the theory of "otherwise unaware." Although Percocet can cause drowsiness, slowed reaction times, slightly slurred speech, muscle weakness, or impaired vision, none of those symptoms affects the crucial factor of "awareness." And Percocet does not cause a person to *fall asleep*, to stay asleep, or to sleep through ordinary stimulus.

We find no support in the testimony of two expert pharmacists to suggest that Sgt W was "otherwise unaware" of the sexual act. The experts' testimony did not even support the government theory that Percocet caused Sgt W to fall asleep or to sleep through the sexual act. Nor did their testimony provide a reason to believe Sgt W would be unable to remember what happened if he awoke during the sexual act. The government's expert testified that fewer than one percent of patients administered Percocet experience memory loss, and the defense expert stated amnesia is not a known side effect. We are further

---

[33] Appellee's Brief of 20 Jul 2017 at 25-26. Although the government made this argument in support of a finding of legal sufficiency, the government incorporated those arguments into its argument in support of factual sufficiency.

swayed by: (1) the government expert's conclusion that it would be "*highly un-likely*" for a properly dosed patient to sleep through anal penetration;[34] and (2) the defense expert's conclusion that it is "*very unlikely*" and "*almost impossible*" that Percocet would cause a person of Sgt W's size to "pass out," even with an excessive dosage.[35] The government presented no evidence to explain why Sgt W would inexplicably react to Percocet in a manner that is dramatically different from the subjects in extensive studies.

In addition, Sgt W was impeached by prior inconsistent statements and by contradictions in the evidence, and made statements we find are not credible.[36] Examining all of the evidence, we do not find it supports the appellant's guilt beyond a reasonable doubt on the offense of conviction.

## C. Lesser Included Offense of Attempted Sexual Assault

When we set aside a guilty finding, we have the power to affirm a finding of guilty on a lesser included offense. Article 59(b), UCMJ, 10 U.S.C. § 859(b); *States v. Medina,* 66 M.J. 21, 24 (C.A.A.F. 2008). The appellee urges us to find the appellant guilty of attempted sexual assault if we reverse his conviction for sexual assault. We decline to do so.

An attempt under Article 80, UCMJ requires proof of the following elements beyond a reasonable doubt: (1) that the appellant did a certain overt act; (2) that the act was done with the specific intent to commit the underlying offense; (3) that the act was a substantial step that constituted more than mere

---

[34] Record at 394 (emphasis added).

[35] *Id.* at 613 (emphasis added).

[36] Specifically, he testified he saw a three-to-four-inch red stain on his comforter, but NCIS agents saw no such stain on the unwashed comforter just 10 days later. Although he claimed he immediately texted the appellant upon waking, we believe his message "[d]id we have sex on the Monday?" was not likely sent immediately upon waking up on Tuesday morning. He further claimed he made an unrestricted report of sexual assault the day after conferring with a female Marine who had done the same. He claimed this female Marine inadvertently learned of his allegation because she overheard Sgt W telling his brother about it. But Sgt W did not tell his brother about the allegation until long after he filed an unrestricted report. Sgt W claimed the appellant texted him to ask, "Was that not okay?" referring to anal sex, but this message was not recovered from Sgt W's screenshots. Although Sgt W stated he sought medical treatment on Tuesday, 21 June 2016, his medical records indicate this initial encounter took place on 24 June 2016.

preparation; and (4) that the act apparently tended to effect the commission of the offense.[37]

The offense of attempt requires the government to prove the appellant specifically intended to commit every single element of the underlying offense.[38] The "'specific intent' which must be proved is the intent to commit the proscribed act." *United States v. Foster*, 14 M.J. 246, 249 (C.M.A. 1982). A specific intent crime "requires that the accused must have acted with the specific purpose of violating the law." *United States v. Axelson*, 65 M.J. 501, 512 (A. Ct. Crim. App. 2007).

The elements of Article 120(b)(2), as remain on appeal, are: (1) that the appellant committed a sexual act upon Sgt W; (2) that Sgt W was "otherwise unaware that the sexual act was occurring"; and (3) that the appellant knew that Sgt W was "otherwise unaware that the sexual act was occurring."[39] To affirm a conviction of attempted sexual assault, we must be convinced beyond a reasonable doubt that the appellant specifically intended to penetrate Sgt W's anus and that he specifically intended to do so while Sgt W was "otherwise unaware."

We find support in *United States v. Langley*, 33 M.J. 278, 281-282 (C.M.A. 1991) that attempted sexual assault requires the government to prove not only that the appellant specifically attempted to commit the sexual act, but that the appellant intended to commit the sexual act while he knew that Sgt W was "otherwise unaware" of the sexual act.[40] In *Langley,* the Court of Military Appeals (CMA) held that the former Article 134, UCMJ offense of assault with intent to commit rape required "the prosecution [to] affirmatively prove that, at the time of the assault, the accused specifically intended to forcibly accomplish sexual intercourse," as opposed to a specific intent merely to accomplish sexual intercourse. *Id.* at 282.

The appellant specifically intended to penetrate Sgt W's anus. He repeatedly stated he did so while he believed Sgt W was asleep and while Sgt W was awake. Although there is ample evidence the appellant specifically intended to

---

[37] MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.) Part IV, ¶ 4b.

[38] Military Judges' Benchbook, Dept. of the Army Pamphlet 27-9 at 177 (1 Sep 2014), Instruction 3-4-1d.

[39] Although the specification alleged that the appellant "knew or should have known," actual knowledge will be required in order to satisfy the specific intent *mens rea* for attempt.

[40] Although the specification alleged the appellant "knew or reasonably should have known," to prove an attempt, the government must show the appellant had actual knowledge of the circumstances which render his conduct criminal.

penetrate Sgt W's anus, even while Sgt W was asleep or unconscious, we find no evidence that the appellant specifically intended to do so while Sgt W was "otherwise unaware."

The appellee cites *United States v. Welch,* 2016 CCA LEXIS 253 (N-M. Ct. Crim. App. Apr. 21, 2016) (unpub. op.), a case in which this court disapproved a finding of guilt for abusive sexual contact but approved a conviction for attempted abusive sexual contact. Although the evidence showed the victim was awake at the time of sexual contact, this court found that Petty Officer Welch believed the victim was asleep and therefore affirmed a conviction of attempted abusive sexual contact. We find *Welch* to be distinguishable. In *Welch,* this court found sufficient evidence of Petty Officer Welch's specific intent to commit sexual contact upon his victim while the victim was asleep. By contrast, here there is no evidence that the appellant knew Sgt W was "otherwise unaware." Nor did the government present any evidence that the appellant specifically intended to sexually assault Sgt W while he was "otherwise unaware." The government only presented evidence to show that the appellant believed Sgt W was asleep at certain points during the sexual act. Without evidence to show the appellant specifically intended every element of the offense, we cannot affirm a finding of guilt to the lesser included offense of attempted sexual assault.

## III. CONCLUSION

When members had a "full opportunity" to convict the appellant of an offense but make no such finding, the legal effect of their action is a finding of not guilty. *See Green v. United States,* 355 U.S. 184 (1957). The government's theory, as developed through witness testimony and as emphasized during the government's argument on findings, was that Sgt W was asleep during the sexual act. In spite of a "full opportunity" to convict on that theory, the members acquitted the appellant. Double jeopardy bars retrial under the two rejected theories of liability, and it likewise bars conviction on attempts based on those theories.

Having found the evidence insufficient to sustain any conviction on the sole remaining theory, the findings and sentence are **SET ASIDE** and **DISMISSED WITH PREJUDICE**.

Senior Judge FULTON and Judge CRISFIELD concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court